Catheter Connections v. Ivera Medical 2014-1443, Mr. Hancock. May it please the Court? There are a number of issues of error that are presented in this appeal, but I'd like to start with one that's not specific to the injunction itself, and that is the amount of the bond set in this case. An injunction is extraordinary relief, and as this Court has expressed many times, it's not to be granted lightly, and there are a number of safeguards put in place when there is injunctive relief granted. It almost sounds like some merits, claim construction or secondary merits, since you're leading off with the injunction. No, Your Honor. I am not. That should not be taken that way. However, the bond is a critical issue, and I think it can be addressed quite quickly, Your Honor. Let me ask you this, though, on the bond. What if the Court had put a zero bond? Would that have failed to put a cap on your ability to come back? Or, in other words, on this issue of the capping, is there a way the Court could have taken into consideration the limited resources of your opponent and still not capped your ability to come back? The case law doesn't seem to indicate that that's the case, Your Honor. It's our understanding of the case law that it is a cap, regardless of whatever amount it is set at, that functions as a cap. If this Court clarifies that there is this opportunity for further redress, one of the problems we have here is this. Catheter Connections, as reflected in the bond order, has extremely limited resources. So it's really sort of a hollow backstop that we may be able to come back later and recover, because, in fact, it's very unlikely there would be money there to recover. And that's the whole purpose of this bond requirement. And, again, Rule 65 could not be more clear. There is a single basis for setting the bond, and that is the potential damage to the enjoined party. Now, the Court clearly did not set a bond based on that amount. It disregarded the plain language of the statute. And on that basis, we believe that order should be vacated and should be The Court did have a hearing after the fact and found that it lacked jurisdiction because of this appeal. So it had no jurisdiction to reconsider the bond amount at that point. And on that basis, deferred to this proceeding for that determination. But at this point, the Court does have a more detailed factual record. The Court just hasn't had the opportunity to address that more detail. That is correct, Your Honor. And, in fact, circumstances did change. IVERA reduced the bond because it successfully designed around the patent and has started selling another product. If we vacate the bond, doesn't that effectively vacate the injunction unless and until the Court sets another bond? The Court has the power, we believe, to determine whether that would vacate the injunction as well or whether that should be stayed pending the new bond amount being set. We do believe that upon the setting of a new bond amount, the injunction should be of that bond just as it is in the first instance. Because it could, in fact, determine a lower bond is required. And I think that's why this Court would have that authority in the interim prior to the next determination to make that stay in effect for the injunction during that time period. With that, Your Honor, I will turn to the merits. Why is a bond inadequate? You're saying it's too low of a figure and you believe that, Ruby just said that, if necessary, you have to collect the money, it's not going to be there, something to that effect. That's correct, Your Honor. For example, IVERA, in subsequent proceedings, predicted, and this is a quite accurate prediction, that its damages as a result of the injunction were in the order of $600,000. There's currently a bond posted for $250,000. If the injunction is ultimately found to have been improper, IVERA will be capped at $250,000 in its recovery, and it will be out that additional $350,000 that it actually suffered in terms of damages. You can still collect that under a judgment. No, Your Honor. We cannot get a separate judgment. The case law is quite clear that the bond acts as a cap. And so IVERA cannot ask the Court for a judgment in the amount of the difference between the bond and its damages and go collect that judgment. That is not allowed under the case law. The bond is the cap, so IVERA would only recover up to the $250,000 limit. Your concern is that, assuming that we, given the standard of review we have here, that we say that at least at the preliminary stage we're not going to find clear error or abuse of discretion and we'll let the PI stand, ultimately, if you prevail on the merits, either because the Court decides with more information a different claim construction would be appropriate, or because they would have that option, or because the jury finds in your favor, that then the best you could do is hope to get attorney's fees, but that doesn't save you from the damage you've already suffered. That's right, Your Honor. And furthermore, it's unlikely we could collect any of those amounts that are not bonded because of the financial condition of the plaintiff. But you do concede that your initial projection of a huge number has been rethought, and you're now talking $600,000. It was mitigated by the ability of IVERA to design around and continue selling a product after some gap. With that, Your Honor, I will move on to the issue of delay, which is part of irreparable harm, and I'd like to talk briefly about irreparable harm, where the plaintiff carries the high burden, again, of establishing urgent, irreparable, substantial, irreparable harm in order to invoke this extreme remedy of an injunction. We have a situation here where a product, a medical device that is important to hospitals in their protection of patient safety, had been on the market since December of 2012. At the time it was launched, Catheter Connections already had three pending patent infringement cases against that product, and it declined to move for a preliminary injunction at any point prior to the launch, when it could have prevented all harm. After launch, throughout the entire year of 2013, when IVERA was investing in this product and developing the market, it had its sales people out creating a market. This is a new market. It requires missionary sales. IVERA devoted substantial resources to create a market for this product. The answer was, and the court so held, that they were waiting for the grant of other patents that gave them a stronger chance of getting the injunction. Understood, Your Honor, but that issue does not go to the question of irreparable harm, and that's the problem. There's a complete disconnect. Well, it goes to whether or not delay could offset any claim of irreparable harm. Isn't that right? Your Honor, essentially, no, because the problem is that if, in fact, there was urgent irreparable harm, they had the ability to seek the injunction. It may not have been granted, but they had this exclusive right that they held in their pocket for 14 months while IVERA was investing. So it's a different question here. One is, are they going to suffer irreparable harm if they don't get the injunction, which the trial court made a finding of facts that they did, and the record was pretty strong on that point. The other point is, are they prohibited from claiming that irreparable harm or relying on that irreparable harm when they delay? And so the delay question is a separate question from the irreparable harm. Yes, they're related, but so the court makes a factual determination that there's a justification for the delay. But do we review the court's refusal to say that the delay is enough to offset the irreparable harm for an abuse of discretion or clear error? What's our review on that? For abuse of discretion, Your Honor, in the context of this preliminary injunction. And in fact, it was an abuse of discretion to rely on the justification for this delay. The case law is quite clear that delay undercuts the claim of urgency which is a cornerstone of irreparable harm. Irreparable harm connotes urgency. And in fact, here in this case, the evidence of irreparable harm was relatively standard measures of patent damages, lost sales, lost profits, price erosion in a two-party market with relatively, in the scheme of things, dollar amounts that are not huge. And these are all things that are routinely compensated in patent infringement cases. And so this irreparable harm delay issue becomes critical in the balancing of this. And frankly, it is improper to discount the delay simply because they wanted to get a better patent, that they were going to just sit and wait until they got a patent they thought they could prove more quickly and easily. It's also telling, in fact, that, and the court, I think, can take judicial notice of this, they have now moved for a patent that they asserted in June of 2012. There is now a pending motion for preliminary injunction against Ivoria's Jurisdict's product in the court. So it can't be that this was so hard. So you moved for a preliminary injunction the day that these patents that are at issue in this case were issued, right? Yes. And so it's your argument that we can't consider the claims of these patents in terms of whether or not there's irreparable harm, that we have to go back and say, well, they had other patents that maybe weren't as strong, but they could have done something and they didn't? The concept is, well, you've raised a separate issue, which is nexus, I think, which is that there is nothing linking the irreparable harm here to the specific claims of these patents, as opposed to the earlier 825 patents. You didn't make that argument until your reply break, though, did you? Your Honor, I believe we did raise the nexus argument in our opening brief. It didn't get a lot of, there's not a lot in there. I do believe it is presented as an issue on appeal. And in fact, this issue of nexus has been present throughout all of these proceedings below and in the briefs themselves. This issue of nexus is an important issue, but it ties in again. It's all interrelated to this issue of what is the delay that we're looking at? Sure, they filed this case the day the patents issued, but they had had the ability to file a motion for preliminary injunction against the exact same product for over 14 months. It's the product that's causing the alleged irreparable harm. If, in fact, that product was causing urgent irreparable harm, they should have filed the motion earlier. And their decision to stand by because they wanted to get a better patent was done at their peril, and it indicates that this was not a truly urgent irreparable harm. I see that I'm down through my time. I'd like to reserve time for rebuttal. May it please the court. Your Honor, this is a case where the district court received briefing provided for discovery and claim construction for a period of almost three months. It had a Markman hearing, an evidentiary hearing over two days. It heard and evaluated expert testimony. Well, I wasn't the court wrong in interpreting engage against to be just contact. In patent, the 681 patent shows all over, they were talking about a forceful contact, interlocking, interfacing contact. I wasn't the court wrong in this. We're talking about engage against. Engage against. And the word against is relevant. It is relevant, Your Honor, as part of the claim. And in that particular claim construction, the court looked at the specification in several places. It also looked at claim 11, where there was a distinction between engage with and engage against. And a good example of that, Your Honor, is found in the patent Appendix 68. And that's... Well, even engage with implies more than mere contact. But the fact is we're dealing with claims 1 and 18, Matthew. Yes, we are. But I think that the claims of the other claims of the patent are relevant in looking at what the claims mean in claims 1 and 18. Well, what's the answer to the question? Well, the answer to the question is that when engage with is looked at, we're talking about the threads of the cap that engage with the inner part of the male lure, the outer threads on the other side. When we're talking about engage against, we're talking about merely the tip going into the... and making contact with the inner edges of the male lure. And there are several places in the specification where, in the same sentence, it distinguishes between those two. It would seem to me, for example, in what you're talking about, when you have the tip, threads are engaging because they start the threading process. Now, that would be contact, but engage against, there still has to be a little bit more. And given that the patent works, once that the tip reaches up against the seal and presses the seal, compresses it to a point to where it releases the antiseptic fluid, it would seem that there's got to be more than just mere contact. Contact is, for example, merely touching something. That's not how this works. That's not how the patent explains itself anyway. Your Honor, if I could draw the court's attention to some places where that actually does explain itself. In the specification in column 30, this is... I'm looking at appendix 115, column 32. Excuse me, I've got the wrong... Go down to line 50, column 32. And there it's talking about, in the illustrated embodiment, and I think it's still looking at 37. Yes, and that is a good example, Your Honor. There's contact. Now, it's talking about contact between the tip and the sealing member. That's right. It occurs just prior to engagement. Yes, exactly. You have contact prior to engagement. Those seem to be two separate things. Your Honor, the engagement in this sentence is talking about the engagement of the threat. And the contact between the tip and the sealing member is exactly what the claim language is where it engages against, where the tip engages against, the tip of the lure engages against the sealing member. And so that is exactly the distinction the court was looking at, because engagement, in the context of the threat, is an interlocking. Engage against is, again, another modifier of the term engage. It's like a car engages against another car when it runs into it. That's an engagement in that context. What about in the 308 passage, the sex? Why is it that clear that that's a depression? Your Honor, here the— Rather than something between two protrudences. Again, the plain meaning of this term recess that came up just at the hearing, just that it wasn't one of the initial claims that was subject to briefing and argument before the Markman hearing. The plain language is that it's a space in between two elevations, whether that's created by digging material out or placing two ribs on either side. The court has recessed for 10 minutes. We're leaving, and there's something missing. Why isn't it something that's taken out, as is shown in many places in this specification? As the court found, there was nothing in the specification that would require that additional limitation on the term recess, of requiring that there be material removed to create it. It doesn't provide that the recess must be created in a certain way. The specification just shows a recess and claims a recess. There was evidence before the court from expert witnesses, from Dr. Durgin, that the recess need not be created in a certain way. But aren't these close questions affecting the likelihood of success in a preliminary injunction? With due respect, Your Honor, these are plain meaning interpretations. And certainly this court can look at those claim constructions again here. Although under the Nutiva case, it does give deference to the extent there was extrinsic evidence offered. Which doesn't appear to be the case here, right? Well, we are looking at the spec. With respect to recess, there is no further enlightenment on that except from the expert witnesses, including Dr. Durgin, the expert witness in this case for Ivera. The court considered that. What about the terms engaged against? To what degree was extrinsic evidence considered? In particular, the expert testimony. Your Honor, there was expert testimony on those issues. So reading the decision, it seems to me that the judge says, well, looking at both sides of this, I'm not going to rely on either side. Your Honor, the opinion looks like Judge Campbell relied on the specification. With respect to engagement. For that particular construction, there's no extrinsic evidence, because the judge relied only on the specification. I think the court could just look at the judge's opinion and look at the specification and see the distinction between those two uses of engage against and engage with. My point there is, in that situation, we don't owe Deva deference. With construction of engaged against. Your Honor, I think the court could look at the record and see that there was extrinsic evidence offered. But in the opinion, I concede that the judge didn't rely on extrinsic evidence in making her decision about engage against. In which case, I don't see that Deva could apply right there on those points. So, Your Honor, if I could address some of the issues raised in Mr. Hangartner's argument. With respect to the bond, I think Mr. Hangartner is overlooking the discretion that a court has in setting a bond. And we cited case law to the court on this effect. In fact, in the Tenth Circuit, the court has wide discretion. And the Ninth Circuit case of Goto versus Disney is very instructive, too. In that case, Disney wanted a $20 million bond to support an injunction in a trademark case. And the court set a $25,000 bond in that case. And specifically, it said that in its discretion, it was not going to deny the plaintiff's judicial review, which would occur if it required a bond that was as large as the defendant in that case was asking for. Disney, I think if we were to take this argument to its extreme that Ivera wants to assert here to the court, a small party could never get injunctive relief against a large party. If we were here seeking, for example, an injunction against Bard Medical or another large medical device company, they might ask for a $100 million or $200 million bond. Injunctive relief would never be available to a company like Catheter Connections. One of the critical arguments you're making here with respect to irreparable harm is that this is really a two-player market and that for every sale that they make, they're taking one away from you. Doesn't that hurt you in that context, in that looking only at your available resources isn't really appropriately considering the harm to the other side? Well, first of all, this court has recognized that you can still have irreparable harm in a two-player market. In fact, sometimes it's enhanced, it's stronger. I don't disagree with that. I'm saying, but doesn't that cut against you the strength of your irreparable harm also shows the strength of the harm to them for being enjoined from the market? Certainly, there's an interaction there. And in fact, it goes the other way too. Ivera was arguing to the trial court that the mail cap was insignificant. It was not a big part of this market. Yet, when it came to the bond, suddenly it was a huge deal and they were asking for a $20 million bond. So there is an interaction between irreparable harm and the harm that might come to the defendant. But now we're just talking about the difference between $250,000 and $600,000. We are, Your Honor. And again, it's within the trial court's wide discretion to consider what size of bond to apply, including to take into account the financial condition of the patent owner. Now, I would also point out that there is evidence in this record from Mr. Hampton, the damages expert, that there is a range of harm that might come to Ivera. And one of those ranges shows that they would have a loss if they were continuing to sell its mail caps. It would have a $200,000 loss over a one-year period. And they're claiming that they would have all these lost profits. The court considered all of that evidence. In its order, it said that it carefully considered all of the evidence. And in its discretion, it decided on a $250,000 bond. As the court noted, the district court reviewed these findings again. It had a five-hour hearing. Right, but then said it couldn't do anything about that. But it also said, after looking at that evidence, that in view of all of the evidence, it was an appropriate amount. So, there was an additional finding affirming. It did acknowledge that it was outside the jurisdiction to change it. But it said that it was appropriate, even after hearing all of that evidence, again, because it fully considered evidence before. But now it took testimony. There were expert witnesses. And Mr. Rogers, on the stand, talking about these issues, and the court still found it was fine. The court, the important thing is, the law is clear, including in the Tenth Circuit, where this case was heard, that the trial court has wide discretion. Going back to the reputable harm and the nexus that was established by the court, when you look at the date of lost sales or lost market share and price erosion, it seems to me that there's evidence in that it draws to question whether you're declining sales or lost profits were as a result of the entry into the market by the competitor. So, if data shows that there's already a downward trend in lost sales, then where is the nexus? Where does the court address that and say, besides that downward trend, this is why the entry into the market has affected the financial condition of the company? Your Honor, first of all, this is unlike the Apple case, where the nexus was found with just specific product features, because the patents here go to the entire device. Right, I'm not talking about that. I'm talking about establishing a nexus between lost sales or declining profits to the infringement, or the entry into the market. Okay, my point is that the entry into the market is of a device that became infringing as soon as these patents issued. The entire device. And so, that shows a trend where continued existence of the infringing product in the market is what would cause the irreparable injury. So, the court looked at a remarkably big record of irreparable... Under this patent, prior to that competition, the data suggests that there's already a decline, there's a trend in your company's or your client's loss of profits. That's right, and it supports a continuing trend if the infringing product is allowed to stay on the market. So, where does the court make the nexus between that continuing trend you're talking about? If the company's already losing money, and you're saying, well, the competitor came into the market, and we continue to lose money, and therefore, it's due to the infringing of the issued device, where's the nexus? Your Honor, I'm not sure I can answer this specific question, but there are references in the judge's findings, in her order and opinion, that talk about the presence of this infringing product on the market causes the irreparable injury, causes the loss of pricing power. I read that, but there's got to be more to it than that, right? I mean, that's just the conclusion of the statement. Where's the analysis when there's a link? She takes the evidence of the record and says, I believe that this downward trend is going to continue for these reasons, based on the record evidence. Your Honor, I see that my time is up, and I would just encourage the court to look at the extensive record on irreparable injury in the court's findings. I believe it is there, and if I could just make one point about delay, Your Honor, because there was a lot of argument about that, and I haven't even had a chance to address it. Iveyra is ignoring the fact that these patents that are the basis of this injunction created a new patent right. It is basically saying it wouldn't have a right to seek an injunction unless it sought an injunction on the first patent issued from a family, and that is not a precedent this court would want to set, where every patent owner that has a family of patents issuing must seek an injunction on the first patent, or loses the right to seek it on any other patent. That is simply not the law here. The Hybratec case, there was a three and a half year delay between the issuance of the patent and the time that the patent owner went after Abbott, and the court found that there were sufficient reasons. One of them was they were waiting for litigation to end with a separate competitor. Thank you, Mr. Snodder. Mr. Handgartner has three and a half minutes left. We'll give you your full five minutes because Mr. Burton took a little extra time. Thank you, Your Honor. First, I'd like to answer Judge O'Malley's question about the causal nexus argument. It is present in the opening brief beginning on page 62. It's perhaps not as well laid out as in the reply, but it is there. So as I understand your nexus argument to the extent that it's made there, what you're saying is even if we give them all these sales, they're going out of business anyway? To a certain extent, Your Honor, but I think it's more specific than that. Initially, there was a lot of argument in this case about the financial condition of catheter connections, and they seem to be linking their alleged irreparable harm to just their poor financial health. And so a lot of argument was presented on that, and that seems to have been part of the court's analysis here. And that's not proper because there is no causal nexus between their financial condition and the features of this patented invention. More specifically in the reply, I think we lay it out a little more clearly that in this situation where the earlier patent that issued, the 825 patent, that they declined to seek injunctive relief, they make a point about the fact that it requires a different element, a biasing member, which apparently to them was harder to prove. And therefore, their harm was not so bad that they had to go ask for an injunction. At that point, they put it off until they got a better patent. Now, we're not saying you always have to sue on your first patent, but if you decline to sue on a patent that reads on the accused product, or I'm sorry, if you decline to ask for an injunction based on a patent that reads on the accused product, that definitely tends to indicate your harm is not that urgent and not that irreparable. It's certainly a factor the trial court has to consider. Absolutely. And that's our point there. The court didn't appropriately consider that. With nexus, this plays into this because, in fact, the court made no effort to tie the irreparable harm at issue today, supposedly, to these new features or the different features of the 308 and the 681 patent as compared to the 825 patent. These new patents don't require a biasing member, but they have very specific requirements. In addition to the basic disinfecting cap features, the asserted claims of the 681 patent require that it have this movable member, that that engage against the interior periphery of the opening to the lumen, some of the claim construction issues that were discussed with Mr. Burton, that there's nothing linking the alleged irreparable harm to those features of this patented invention. Nor is there any indication linking the alleged harm to the gripping feature. It's a gripping feature. It's some ribs on the side of a cap. No customers talk about how wonderful that gripping feature is. There's no evidence that customers care about the sufficiency of that engagement with the inner periphery. There's no nexus between those patented features and the alleged damages resulting to catheter connections. There's no customer saying, this is the greatest thing about this. There's no advertising presented saying that this is the key feature. There was not that nexus established, and there was no finding at all. Well, who is going to argue that there's no need to establish a nexus, at least to a great degree, given that this is a two-horse market? There's only two competitors here. Even in a two-horse market, though, Your Honor, the damage needs to be linked to the patented features, not just that we're selling a cap. And so there still has to be some showing to establish that nexus between the patented features and the alleged harm. And looking at these patented features, it's really interesting. The court discussed engage against. The specification is quite clear, that engagement is not mere contact. You say that, but you don't cite a single sentence from the specification in your brief. You only rely on the testimony of your expert. Your Honor, I believe we did cite, in fact, that column 32 discussion and figures 41 to 45, which walked through and highlight this distinction, where the specification actually indicates a difference between contact and engagement. But it's not at that point. It's talking about engagement as it relates to the connector interface, not as it relates to simply entry. It's talking about, so it's interesting, because it talks about, at the time, contact is made between the ceiling member and the inner periphery. It then refers to the simultaneous engagement of the connection interface, which is the threads. And it uses engagement in that context. It's a clear distinction between the idea of contact, which it's referring to. Specifically, it says, in the illustrated embodiment, contact between the tip, 2021, and the ceiling member, 2290. So that's the contact that it's referring to, just prior to engagement of the connection interface. So that is the thread. So it says it in the claim, too. The contact is the engage against, and then the engaging is what happens between the connector and the connector interface. But this is where that falls apart. This is a step in the process, and it continues to describe what happens then. The threads, when they engage, apply a force to the ceiling member. And there's a critical aspect of this path. They apply a force to the ceiling member, which takes it beyond contact. It drives the tip of that ceiling member against that inner periphery of the wall. So the specifications description of that interaction is completely consistent with the idea of engagement not being mere contact, but it's that contact. And then there's a connection interface for a biasing member that applies a force. That's the resistance concept, which is why, Mr. Hancock, and even though we gave you extra bottle time, your red light has been on for a while. So we'll take the case on your advice. Thank you very much.